UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-77 (DWF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S POSITION ON |
| | ) | SENTENCING FACTORS |
| ABDUL RAHEEM ALI-SKELTON, | ) | |
| | ) | |
| Defendant. | ) | |

When he was approached by the FBI and questioned about his contact on social media with two British nationals who were involved in recruiting for ISIS, defendant Abdul Raheem Ali-Skelton panicked. Only 22 years old at the time, he admitted that he had had contact with these men in the past, but denied current communication with them. Instead, he concocted a fanciful idea that if he could discover a terrorist attack these men were planning, he could provide that information to the FBI and be a hero. The plan failed. The men did not trust Mr. Ali-Skelton, and he was unable to uncover any actionable intelligence. Fearing that he could be prosecuted for his ongoing communications, he continued to lie to the FBI about when he had last communicated with these men.

Within weeks of the appointment of counsel, Mr. Ali-Skelton met with the government to correct his earlier lies. As a result, within a matter of weeks after the false statements occurred, Mr. Ali-Skelton had fully corrected them. What is most important, however, is that Mr. Ali-Skelton never contemplated committing any act of violence. He never took steps to join or support ISIS. In fact, as soon as he became aware of ISIS's ideology, he was repulsed and rejected it as inconsistent with Islam. As the Court's own expert seems to agree, Mr. Ali-Skelton does not pose a danger to anyone. In the context of this case, a probationary sentence is

appropriate.

FACTS

Mr. Ali-Skelton was born William Sebastian Skelton in Cedar Rapids, Iowa. He was raised Catholic. His parents divorced when he was three years old. PSR ¶ 60. He lived with his mother who remarried when Mr. Ali-Skelton was four. He had a strong relationship with his mother and stepfather.

Abdul had a normal, healthy upbringing. He played basketball and ran cross country in high school and played several instruments, including piano, guitar, trumpet, and bass. He did well in school. PSR ¶ 64. At the same time, he was a social chameleon. Nearly all of his friends and the girls he dated were African-American, and he developed an African-American rapper persona, wearing oversized t-shirts, sagging pants, and gold chains. Exhibit A at 4-5, 6 (Report of Ernest Boswell, Ph.D.). He also began to affect a black dialect in his speech. *Id.* at 6.

When he was 16, Abdul became interested in Islam. He explains that he was looking for a set of rules to guide him, and the spirituality of Islam appealed to him. He taught himself about the religion online. He converted at age 17. He started wearing robes and head coverings. Ex. A at 5. He waited until he was 18 to change his name, at his mother's request. PSR ¶ 67. Significantly, Abdul's father learned from the Imam at the mosque that Abdul attended that his conversion was motivated by his interest in a Muslim girl who would not date a non-Muslim. Ex. A at 6.

Although the high school relationship did not endure, Abdul's interest in Islam did. In December 2012, Abdul met Shukri Baaluul. Within a few weeks of meeting, they married in a cultural ceremony. PSR ¶ 66. In October 2013, they had a baby girl, Maysoon. Abdul describes this as the best day of his life. Koehler Report at 2.

Abdul and Shukri both hoped to better themselves by strengthening their religious observance, but neither had the self-discipline to follow the tenets of Islam. He studied Islam online, but he also drank alcohol, did illegal drugs, and got tattoos. He also was a rap artist and was very devoted to his music, although he also listened to anasheed, traditional chants popular throughout the Islamic world. Because he was working long hours, he rarely went to mosque. Koehler Report at 2.

Following the birth of his daughter, Abdul became more aware of the situation in Syria, and the brutality of the Assad regime. He wanted to do something to help. His foremost interest at the time, however, was supporting his wife and daughter. Koehler Report at 2. He began to research different groups that were helping the Syrian people, including ISIS. He saw ISIS videos that showed the group defending the Syrian people. He was impressed with their efforts to create an Islamic State, which he understood to be a peaceful, utopian society. *Id.* But later videos he saw conflicted with his initial impression. Increasingly the videos changed from helping people to executing them. He saw that ISIS was implementing a harsh system of Islamic law, which did not resonate with Abdul. In his view, Islam teaches tolerance and peace, yet the messages from ISIS continued to get worse. He recalled one video in particular which showed people being shot en masse and thrown into a river. Another showed people forced to dig their own graves before being killed. Abdul was repulsed. *Id*

As a result of this conflict in his own mind, Abdul interacted with a lot of people online debating what ISIS was doing. Through these contacts he was referred eventually to two men who he knew as Abu Dujana and Abu Hussain (Khan and Hussain). At first, Abdul did not realize these men were ISIS recruiters. He tweeted with them about theology and ISIS's agenda. At first, their views were moderate, but over time they became increasingly extreme. Abdul

recognized that some of the statements they made, rationalizing violence against innocent people, was inconsistent with the teachings of Islam. In 2014, Abu Dujana solicited Abdul to carry out an attack in the United States. Abdul adamantly refused. In response, Abu Dujana blocked contact with him, and Abdul disengaged from social media. Koehler Report at 2-3.

Abdul's drug use, which included marijuana, OxyContin, Adderall, and Xanax, and his alcohol consumption continued to increase through 2014 into 2015. *Id*. at 3. Although by this time he knew that Abu Dujana and Abu Hussain were extremists, his curiosity got the better of him. He got back in touch with them because he wanted to shake up his routine. He viewed these tweets as harmless, but they made him feel like somebody. Interacting with them was exciting and something to do. *Id*.

Abdul did not take these contacts seriously until the FBI showed up. At that point, he panicked, afraid he was in a lot of trouble. He was scared, but he also liked the drama and excitement. *Id*. He told the FBI he was no longer in touch with Abu Dujana and Abu Hussain, while at the same time, he hatched a fanciful plot that he could develop some important intelligence and provide it to the FBI. He thought he was somehow important to Abu Dujana and Abu Hussain and that they would reveal their plans to him. He fantasized that if he foiled a terrorist plot, not only would he redeem himself in the eyes of the FBI, he would be a national hero as well. *Id*.

The FBI first spoke to Abdul on June 17, 2015. They met with him a number of times following that initial meeting, including on July 16, 2015. On that occasion, they questioned Abdul about what contacts he had had with the two men since the agents had first approached him. Abdul insisted that he had had no further contact with these men during that time. In fact, he had continued his social media exchanges with them while he was trying to carry out his plan

to uncover a terrorist plot.

In September 2015, the government subpoenaed Abdul to testify in the grand jury. As a result, the Court appointed undersigned counsel to represent Mr. Ali-Skelton. Within a matter of weeks of being represented by counsel, Mr. Ali-Skelton met with the government to correct his earlier statements about his contacts with the men. Thus, Mr. Ali-Skelton had corrected his false statements shortly after having made them. By then, it was too late. The government insisted that it was going to charge Mr. Ali-Skelton with a violation of 18 U.S.C. § 1001 for making false statements. Mr. Ali-Skelton agreed to plead guilty to an Information.

Throughout the period of meeting with the government, correcting his misstatements, agreeing to plead guilty, and negotiating a plea agreement, Mr. Ali-Skelton remained on the street. The government apparently did not perceive Abdul to be a danger to the community, and it took no steps to take him into custody. The government issued a summons for him to appear for his initial appearance and guilty plea to the Information to which he had agreed to plead guilty.

That changed on March 27, 2016 when Abdul was arrested by the Brooklyn Park Police for making terroristic threats at a Walgreens.[1] Earlier that night, Abdul had performed at a rap venue. He had used cocaine, marijuana, alcohol, and Xanax. He blacked out during the evening. At some point, he saw his wife with another man at the Walgreens. Abdul and his wife were separated at the time. Believing the two were romantically involved, Abdul went into a jealous, drunken rage. He began shouting things to get a reaction. He threatened the man with a beer bottle in his hand and made threats to blow up the store. Store employees called the police, and

---

[1] The government states, wrongly, that this incident happened while Mr. Ali-Skelton was on pretrial supervision. Doc. No. 32 at 4. In fact, it occurred several weeks before his initial appearance. He was never on pretrial release in this case.

Abdul was arrested and charged with making terroristic threats. PSR ¶ 59. When the police arrived, they determined that Mr. Ali-Skelton had no weapons or explosive devices on his person or in his car. He had no way of following through on his threats and had no intention of doing so. Nonetheless, he has remained in custody since that time.

Abdul pleaded guilty to the state court charge of making terroristic threats. On August 31, 2016, he was sentenced to a stay of imposition of sentence, 3 years probation, with a condition that he serve 28 days in custody, the time he had already served in state custody before being transferred to federal custody. If he successfully completes his term of probation, the conviction will be reduced to a misdemeanor. The lenient sentence reflects that the state court that adjudicated the matter recognized it for the minor episode that it was.

In retrospect, Abdul recognizes that he is in the situation he is because he was stupid. He talked to people he shouldn't have and said things he shouldn't have. He understands that lying to the FBI and trying to foil a terrorist plot were misguided. Still, in these troubled times, the Court must take seriously every such statement and attempt to assess the speaker's true motivation and agenda. In this case, the evidence is overwhelming that Abdul Ali-Skelton is not an extremist, and he does not pose any danger to the community. His behavior in this case can best be understood as a consequence of his drug and alcohol abuse at the time of the offense and his diagnosis for histrionic personality disorder, discussed below. In keeping with that diagnosis, Mr. Ali-Skelton expresses himself dramatically, in a way intended to draw attention to himself. He is impulsive and expresses himself in an exaggerated, provocative way, without thinking through the likely impact of his comments on others.

For the reasons discussed below, we ask the Court to impose a probationary sentence.

ARGUMENT

The guideline applicable to a violation of 18 U.S.C. § 1001 is U.S.S.G. § 2J1.2. That guideline calls for a base offense level of 14. Because the false statement related to international terrorism, a 12-level enhancement applies under § 2J1.2(b)(1)(C). No other enhancements under § 2J1.2 apply. With a 3-level reduction for acceptance of responsibility, this results in a total offense level of 26. Mr. Ali-Skelton is in criminal history category I. With a 3-level reduction for acceptance of responsibility, the applicable guideline range would be 46-57 months.

This guideline range is trumped, however, by § 3A1.4, which provides for a substantial adjustment in any case "that involved, or was intended to promote, a federal crime of terrorism." That section also provides for a 12-level enhancement in the otherwise applicable guideline range, but sets a minimum offense level of 32. (Section 2J1.2 provides that if § 3A1.4 applies, the terrorism enhancement in § 2J1.2(b)(1)(C) is not to be applied as well. U.S.S.G. § 2J1.2 comment. n. 2). In addition, it enhances the criminal history category to VI for all offenders to whom this enhancement applies. Applying these enhancements increases the applicable guideline range from 46-57 months to a staggering 151-188 months (off. Level 29, CHC VI). Because this range far exceeds the 8 year statutory maximum, the statutory maximum becomes the applicable guideline range.[2]

_____

[2] The parties agreed in the plea agreement that the terrorism enhancement in § 3A1.4 applies. There is serious question whether that conclusion is correct. *See, e.g., United States v. Benkahla*, 501 F.Supp. 2d 748, 752 (E.D. Va 2007) (noting no court has ever applied enhancement for obstructing justice in general terrorism investigation), *aff'd*, 530 F.3d 300 (4th Cir. 2008); *United States v. Biheri*, 356 F. Supp. 2d 589 (E.D. Va. 2005) (rejecting enhancement). The Sentencing Commission plainly envisioned that not all cases under 18 U.S.C. § 1001 involving terrorism would be subject to the enhancement, since it created a separate terrorism enhancement under § 2J1.2 applicable when § 3A1.4 *does not apply. See* § 2J1.2(b)(1)(C); comment. n. 2. It appears that the § 3A1.4 enhancement was only intended to apply when a defendant lies to cover up or promote a specific act of terrorism. *Benkahla*, 501 F. Supp. at 752-53. Lying to government agents in the context of a general terrorism investigation, such as occurred in this case, is not sufficient. If § 3A1.4 did not apply, the guideline range would be 46-57 months, not 8 years. For

Strikingly, had Mr. Ali-Skelton committed the identical offense, but the false statements he made to the police did not relate to ISIS, his guideline range would have been 10-16 months (offense level 12, CHC I).  This guideline range far more accurately captures the actual offense conduct here.

Not surprisingly, the sentencing guidelines treat offenses that involve acts of terrorism far more harshly than other offenses. Even so, the guidelines here significantly exaggerate the severity of the offense and the culpability of Mr. Ali-Skelton. Mr. Ali-Skelton lied to the FBI; he did not commit, promote, or cover up a terrorism offense. The guidelines far exceed a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. The factors under 18 U.S.C. § 3553 warrant a substantial downward variance and a sentence of probation.

I.      The Terrorism Enhancement Overstates the Severity of the Offense and the Culpability of the Defendant

A.      The Defendant Did Not Obstruct a Terrorism Investigation

The Sentencing Commission treats an offender whose offense "involved, or was intended to promote, a federal crime of terrorism," as among the most serious of offenders, comparable to a career offender. § 3A1.4. This case does not fall into that category. When the Sentencing Commission created that enhancement, it was not contemplating a case such as this one in which the only crime is making a false statement that happened to relate to the general topic of terrorism. If taken literally, § 3A1.4 fails to differentiate between a defendant who *commits* an act of terrorism and one who simply lies in the context of a general terrorism investigation. The result is a guideline range plainly disproportionate to the latter offense. As one district judge has

_____

the reasons explained in this memorandum, either guideline range is grossly excessive in the context of this case. In any event, because defense counsel, perhaps erroneously, agreed to the § 3A.1.4 enhancement, this memorandum will assume the applicability of that guideline.

said, "Section 3A1.4 may make no distinction between an individual that directly promotes a federal crime of terrorism and an individual that obstructs an investigation into a federal crime of terrorism, but to the contrary, this Court does. To do otherwise would be to act in complete disregard of the § 3553(a) factors and principles of proportionality." *United States v. Benkahla*, 501 F.Supp. 2d 748, 752 (E.D. Va 2007), *aff'd*, 530 F.3d 300 (4th Cir. 2008).

In this case, in contrast to *Benkahla*, there was no specific act of terrorism under investigation, but only a generalized collection of information. Even with respect to that, moreover, Mr. Ali-Skelton did not obstruct the investigation. At the time the agents asked Abdul about his contacts with Abu Dujana and Abu Hussain, they already knew about his social media contacts with these men. His false statements did not obstruct any investigation because the agents were never misled. Granted, Abdul's false statements may reasonably have caused the FBI to wonder why he was lying, whether he was covering up another offense. But the answer to that question was no. Abdul lied because he was scared and because, as is discussed below, he has a tendency to act impetuously and create drama around himself. Had he simply told the truth, he would not have been charged with any crime.

Unlike the typical false statement case, therefore, Abdul did not lie to cover up a crime by himself or someone else. He did not commit a crime, attempt a crime, or contemplate a crime. There was no crime.  There was simply a false statement. The guidelines fail to differentiate between cases where a defendant lies to prevent discovery of another offense and those, like this one, where the lie is the only crime. For these reasons, this case is substantially less serious than the typical false statement case.

In addition, here Mr. Ali-Skelton corrected his false statements within a matter of weeks of having made them. There was no attempt to perpetuate the offense conduct. The offense

began and ended within a couple of months.

      **B.**     **Defendant's Offense Conduct Was A Product of Diminished Capacity**

U.S.S.G. § 5K2.13 authorizes a downward departure for a defendant who committed an offense while suffering from a significantly reduced mental capacity which contributed substantially to the commission of the offense. The Court may also consider the defendant's mental health as a basis for a downward variance as part of the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)((1), and the need for the sentence imposed to provide the defendant with needed medical care, § 3553(a)(2)(D).

Mr. Ali-Skelton's offense conduct was a product of mental illness. At the request of the defense, Dr. Ernest G. Boswell conducted a psychological evaluation of Mr. Ali-Skelton. Dr. Boswell has been a Board-certified clinical psychologist since February 1992. He has been conducting forensic assessments for nearly twenty years. His curriculum vitae is attached as Exhibit B.

Dr. Boswell met with Mr. Ali-Skelton over three days for a total of ten hours. He conducted collateral interviews with both of Mr. Ali-Skelton's parents. He reviewed a variety of documents, including the presentence report and FBI reports. In addition, he administered a comprehensive battery of psychometric tests.

Dr. Boswell's report is attached to this memorandum as Exhibit A (filed separately under seal). In his transmittal letter accompanying his report, Dr. Boswell summarized his findings as follows:

> As noted in the assessment there is no credible evidence that Mr. Ali-Skelton is a hard core radicalized Islamic terrorist. Rather, his beliefs and actions related to his current federal charges are the result of mental illness. Specifically, histrionic personality disorder and multiple substance use disorder. It is critical that Mr. Ali-Skelton be provided access to mental health treatment at the earliest possible opportunity. Given that he is permitted access to such services his prognosis is

favorable. He is not viewed as a high risk for future offending.

Ex. A at 1.

Dr. Boswell diagnosed Mr. Ali-Skelton as suffering from Histrionic Personality Disorder. Ex. A at 14. The essential feature of this mental illness is "pervasive and excessive emotionality and attention-seeking behavior. Individuals suffering from this disorder want to be the center of attention and engage in speech and behavior to draw attention to themselves. They express opinions or beliefs in dramatic fashion, without basis in sound reasoning." *Id*.

Dr. Boswell notes that since adolescence, Mr. Ali-Skelton has attempted "to gain attention by expressing attitudes and beliefs in exaggerated and dramatic fashion." *Id*. at 15. He displays a high degree of impulsivity "as a result of being overwhelmed by circumstances and not thinking through the consequences of his statements and actions." *Id*. For example, in high school, he strongly identified with rap culture, gangster dress style, and Black language patterns. He only dated African American women. He made grandiose and exaggerated statements as part of a rap at school which was interpreted as a threat. PSR ¶ 71.

Then, at the age of 16, he converted to Islam. This was even better than gangster rap as a way of provoking a reaction. He began wearing robes and a headdress. If one wanted to stand out and poke a finger in the eye of conventionality, what better way to accomplish it than to convert to Islam after the September 11 attacks? To ensure that no one missed the message, he then changed his name from William Skelton to Abdul Raheem Habil Ali-Skelton.

The observations of Abdul's parents are completely consistent with Dr. Boswell's diagnosis. His mother commented that Abdul's "biggest problem is saying things in an impulsive manner without thinking about the implications and consequences of his words and beliefs." Ex. A at 5. Similarly, his father explained that Abdul "had a strong tendency to be dramatic and seek

attention through his dress, vocalization and interaction. He saw Will's behavior saying, 'Look at me.'" *Id.* at 6. Abdul's father noted that his son had been an avowed atheist before discovering Islam. *Id*.

The Walgreens incident is another example of how, when emotionally overwhelmed, Mr. Ali-Skelton resorts to inflammatory language that is certain to provoke a reaction. Jealous that his wife was with another man, he made irresponsible statements about ISIS and blowing up the store. But the circumstances reveal that Mr. Ali-Skelton had no intent or ability to carry through on his threats. He caused understandable alarm in those present, but he had no gun or weapon of any sort on his person or in his car. By making provocative statements he dramatized his own emotional upset and without thinking about the consequences, ensured that he was the center of attention, even if that attention was wholly negative.  Most people grow out of such tantrums. Abdul hasn't.

Mr. Ali-Skelton's mental illness contributed substantially to the instant offense conduct. First, he sought out contact with Abu Dujana and Abu Hussain specifically because it was exciting and made him feel important. Koehler Report at 3. Social media gave him an anonymous and safe platform from which he could engage, but still feel the thrill of lurking danger. He was like a child playing with matches.

Second, once the FBI contacted Abdul, he did not have the ability to properly assess the seriousness of his situation and answer their questions truthfully. Instead, he was flattered by the attention of the FBI, just as he was flattered by the attention of his social media contacts. Without thinking through the consequences, he developed a ridiculous plan, little more than a flight of fancy of his own imagination, that he would uncover a terrorist plot and reveal it to the FBI. He emphasized to the FBI how he had to keep up a front with Abu Dujana and Abu Hussain

because they can hit anyone anywhere. He said he felt like "a spy," who was working against them while, at the same time, building their trust. PSR ¶ 23.  In the same conversation he described himself as a "secret agent" or a "double agent." In a telling remark, he said "My life felt like a movie." Meanwhile, Abdul played along. "I was trying to get information from them. To be honest, I was waiting until I had something solid, then I was going to come forward to somebody with it." PSR ¶ 23.  He said that they had hacked Tony Blair, so they can reach anyone and kill them. In Abdul's mind, he was of such critical importance, that he might be on ISIS's hit list. It wouldn't be hard for them to find me, he warned the FBI. These are people who can hunt me down and kill me, he said.

At the same time, although the FBI attempted to reassure him, Abdul continued to express his belief that he could be arrested for simply talking to these men. He said that if anyone found out he was talking to them, he would end up in jail. In his own mind, he created a fanciful story where he needed to continue his contacts with these men for fear that if he cut them off abruptly, they would view him as an enemy and kill him. And through his continued contacts, he could foil a terrorist plot. He would be a hero, and he would create good will with the FBI to avoid prosecution for having communicated with these men in the first place.

The government understandably expressed skepticism about the credibility of Abdul's far-fetched plan, because the prosecutor is trying to analyze it rationally. The plan was not rational. It was decidedly *irrational.* In fact, it was little more than a fantasy, a direct manifestation of his histrionic personality disorder. Dr. Boswell concludes that Abdul

> made false statements to the agents because he liked the attention and drama it
> afforded him. . . . The pattern of initial denial and false statements followed by
> ultimate disclosure of relevant facts is consistent with histrionic personality
> disorder. Mr. Ali-Skelton's initial misleading statements to the FBI agents
> illustrated his inability to regulate emotional process and desire to be the center of
> attention.

*Id.* at 18.

The other disturbing episodes the government chose to highlight in its sentencing memorandum similarly fit perfectly into Abdul's histrionic personality mindset. Doc. 32 at 3-4. As filtered through his mental illness, Abdul sees himself as an actor in an epic drama. He views his life like a movie, with God repeatedly stepping in at the last minute to save him from tragic missteps, when in reality, this is nothing but illusion. For example, he told the agents that he wanted to go to Syria, but "God saved me from something I shouldn't do." PSR ¶ 16. In reality, he did not save any money for this trip, and he did not even obtain a passport. Dr. Boswell states, "The fact that he failed to obtain a passport is further evidence that his efforts to save money to travel to Syria was a psychological illusion and product of his mental illness, and not part of serious radicalized Jihadist beliefs." *Id.* at 17.

Abdul's statement to the FBI agents that he nearly killed someone named D.R. falls into the exact same motif. Doc. No. 32 at 3. While speaking to the Federal agents, out of the blue Abdul blurted out that he had nearly killed D.R., whom he believed had broken into his house. But as with his imagined trip to Syria, God stepped in at the last moment to save the day: "God saved me and him from that fate because . . . as I was literally about to do it, a squad car pulls into the alley and shines their light at us." PSR ¶ 10-11. Once again, Abdul was saved by a miraculous divine intervention. What rational person would disclose to the FBI a plot to kill someone? This was not even responsive to a specific question. It was a digression. Abdul related the story to the agents in detail and with obvious, relish, apparently oblivious to the fact that he was implicating himself in an attempted murder. Once again, Abdul created a fantastical drama, in which he played the starring role.

Even the FBI agents did not take the story seriously. After Abdul recounted this dramatic

tale, one of the agents said, "So you're not friends with him?" and they all laughed heartily.

Abdul now admits he grossly exaggerated this encounter when he described it to the FBI. In fact, he believed D.R. had stolen from him, and he confronted him, but the rest of the story is fiction. He never confronted D.R. with a gun, and he never undertook a plan to kill him. When he spoke to the FBI, Abdul was simply trying to show that he had nothing to do with D.R., who he considered to be a bad person. That he thought he could better his position by making up a near murder further demonstrates his histrionic personality and irrational thought patterns.

Similarly, Abdul saw his embrace of Islam as a means to pure living. Once again, however, the reality was that even after his conversion, and continuing until his arrest, his lifestyle was the antithesis of Islamic beliefs, involving alcohol and drug abuse, tattoos, rap music, and promiscuous extramarital sex. As Dr. Boswell concludes, "his professed values of pure living was a psychological illusion." Ex. A at 17.  In fact, "Mr. Ali-Skelton was captivated by the attention his atypical religious beliefs provided." *Id.*

Abdul Ali-Skelton is not a reliable or credible source of information about himself, not because he falsely minimizes his prior misconduct, but because he falsely exaggerates it for dramatic effect.

The guidelines do not contemplate a defendant who lies to federal agents, not to conceal illegal activity, but simply because it creates dramatic tension and makes him feel important. Abdul was flattered by the attention of the agents. In his conversations with them, he held forth on his views of ISIS and how to defeat them, as if he is an expert on the subject. In reality, this was only one more illusion.

Effective psychological treatment exists for histrionic personality. *Id.* at 19. Dr. Boswell opines that Mr. Ali-Skelton is in need of "intensive insight oriented therapy with cognitive

behavioral emphasis." Dr. Boswell notes that Abdul's test results indicate that he "has a favorable attitude toward psychological treatment and would likely achieve significant success from such therapy." *Id.*  As a result, his prognosis is positive and risk of re-offending low. *Id.* at 1.

      C.     The Defendant Never Held Radical or Extremist Beliefs

Daniel Koehler, who evaluated Mr. Ali-Skelton at the request of the Court, agrees with Dr. Boswell that Mr. Ali-Skelton's risk of offending in the future is relatively low. Mr. Koehler places him in the "low to medium" risk category, the second lowest of the five categories used by Mr. Koehler (low, low to medium, medium, medium to high, high). *United States v. Yusuf*, 15-CR-46, Transcript of testimony, Doc. No. 104 (MJD) (D. Minn. Sept. 20, 2016) at 51.[3] By comparison, of the nine defendants recently sentenced in the recent cases of *Yusef, United States v. Ahmed,* 15-CR-49 (MJD) (D. Minn.), and *United States v. Warsame*, 16-CR-37 (MJD) (D. Minn.), only one, Abdullahi Mohamud Yusuf, was rated as low to medium.[4] The Court sentenced him to time served. None of the defendants received a low rating.

Mr. Koehler explained that in determining the risk category he focuses on the presence of what he calls "role residuals" in the subject. Mr. Koehler explained that a person has various roles in his life—husband, friend, attorney, soccer player. T. 104. When a person "end[s] up in the violent extremist or radical group, these other roles are either pushed aside or completely taken over and sucked into that major role." T. 105. The role of "Jihadi warrior" carries with it its own elements that define the role, according to Mr. Koehler, such as, for example, "stop

---

[3] In order to ensure a complete record in this case, Mr. Koehler's testimony in the *Yusef* case, as well as his CV, are attached hereto as Exhibits C and D.

[4] Mr. Koehler rated Mr. Yusuf as "medium to low" risk. T. 100; 15-CR-46, Doc. No. 109 at 17 (Court's Sentencing Memorandum). Mr. Koehler did not explain how "medium to low" risk differs from "low to medium" risk. For purposes of this discussion, we assume they are the same.

listening to music or stop meeting with non-Muslim friends, do not shake the hands of a woman, do not look them directly in the eye, . . . preparing for performing jihad . . . ." T. 105. Once a subject leaves the radical group, "the more role residuals you take with you, the higher the risk that you do not find your place in a new environment." T. 105-06.

Someone in a low to medium risk category, according to Mr. Koehler, has "minimal role residuals," indicating "some need for critical reflection." T. 52. A person in this category "has not yet been 100 percent de-radicalized, but there's already a very advanced stage of disengagement and critical reflection." T. 100.

According to Mr. Koehler, Mr. Ali-Skelton "developed a detailed Salafi-Jihadi identity mainly between late 2014 and early 2016." He points to three "specific forms of behaviors" that, in his view, "signaled his increasing deplurlization (or radicalization) process." Koehler Report at 5. If Mr. Koehler's analysis had any scientific legitimacy, this might be troubling to the Court. Unfortunately, it does not.

First, the three specific behaviors on which Mr. Koehler relied do not support his conclusion. According to Mr. Koehler, Mr. Ali-Skelton's "increasing depluralization" was evidenced by 1) interaction with ISIL members; 2) participation in street protests; and 3) production of nasheeds. These will be considered in turn.

There is no question that Mr. Ali-Skelton interacted over social media with ISIS members. He did so initially while he was trying to learn about ISIS and later because it was exciting. Then, as is discussed above, he continued his contact based on his own misguided fantasy that he could be a hero if he could foil a terrorist plot. What is most significant about Abdul's interaction with ISIS members is that he *rejected* their support of violence. When he did so in 2014, they blocked his account. He resumed contact in order to make himself feel

important. This was completely consistent with Mr. Ali-Skelton's histrionic personality disorder, diagnosed by Dr. Boswell. Unfortunately, Mr. Koehler did not consider a psychological basis for Mr. Ali-Skelton's actions, nor is he qualified to do so. At no time did Mr. Ali-Skelton join ISIS, ally himself with ISIS, provide support to ISIS, or endorse their acts of terrorism.

The street protests noted by Mr. Koehler apparently refer to Mr. Ali-Skelton's participation in a sit-in at the Minneapolis Police Department Fourth Precinct station in support of the Black Lives Matter movement following the Jamar Clark shooting by Minneapolis police officers. Mr. Ali-Skelton made reference to this demonstration on his Facebook page, which Mr. Koehler reviewed. Mr. Koehler does not explain how Mr. Ali-Skelton's participation in this protest reflects development of a "Salafi-Jihadi" identity. The thousands of good citizens all over the country who have exercised their First Amendment rights to peacefully protest the shooting of unarmed African American men would be surprised indeed to learn that by making their voices heard, they are reflecting a "Salafi-Jihadi" identity. Perhaps the FBI would be wise to investigate the hearty souls currently camped out at Standing Rock, the latest hotbed of Jihadi sympathizers.

If Mr. Ali-Skelton's support of the Black Lives Matter movement has any relevance to this proceeding whatsoever, it is in demonstrating that the radical role surmised by Mr. Koehler did not supplant Abdul's other role identities. Black Lives Matter has nothing to do with Jihad or Islam. The fact that Mr. Ali-Skelton at all relevant times remained civically engaged with his local community is completely at odds with Mr. Koehler's explanation of how the role of Jihadi warrior supplants all other roles. Mr. Ali-Skelton was not a radical extremist, and his civic engagement in support of the local community establishes it.

Mr. Koehler's reliance on what he describes as "production of nasheeds" is both factually

and logically flawed. A nasheed is a work of vocal music either sung a cappella or accompanied by percussion instruments. This is in keeping with the view of many Muslim scholars that Islam prohibits the use of musical instruments except for some percussion. *See* https://en.wikipedia.org/wiki/Nasheed. Nasheeds are popular throughout the Islamic world. *Id*.

Mr. Ali-Skelton is a rap musician. It is unclear whether Mr. Koehler is treating Abdul's gangster rap compositions as nasheeds, but he has never produced a nasheed. But even if he had, it certainly does not have any bearing on whether he ever was a Jihadi. Apparently, nasheeds are used in ISIS propaganda videos. But the fact that this traditional music has been embraced by terrorists does not mean that people who enjoy this music are terrorists. Mr. Koehler's analysis suffers from the fundamental logical flaw illustrated by the specious argument that because all Chihuahuas are dogs, all dogs are Chihuahuas. In Mr. Koehler's view, because (supposedly) all Islamic terrorists hold fundamentalist beliefs, everyone who holds fundamentalist beliefs reflects a Salafi-Jihadi identity. It is for that reason, as noted above, that he views such fundamentalist beliefs as opposition to music or unwillingness to touch a woman as being a sign of radicalization. In fact, it is only a sign of fundamentalism. One wonders how many role residuals a random Muslim off the street would have, in Mr. Koehler's assessment,

Imagine a terrorist organization whose members are Orthodox Jews. In Mr. Koehler's view, keeping Kosher would be a worrisome role residual, evincing radical beliefs. This is offensive. It is inappropriate to equate the dictates of a religion with evidence of Jihadi beliefs.

Granted, if a person who has been largely secular suddenly adopts extreme religious views, that could be a troubling warning sign of a possible evolution to radical thinking. That is certainly not the case here. Throughout the period of his supposed radicalization, Mr. Ali-Skelton was drinking alcohol, using drugs, getting tattoos, and writing and performing rap music—all

anathema to fundamentalist Islam. Mr. Koehler conducted collateral interviews with Abdul's

wife and parents. None of them noticed any change in his behavior during 2014-16. He did not

become fixated on religion or on Syria. His wife described herself and Abdul as "a normal

married Muslim couple." They did not argue about religion, and he did not pressure her about

religion. He never expressed to her an opposition to music.

His father said that Abdul had no interest in violent or terrorist acts or associating with

people who do. He said that Abdul believed those people are not true Muslims "because Islam is

about peace." He did not notice any change in his personality or recall any statement that seemed

out of character. He said that Abdul is all talk. In the past, he had tried to warn Abdul that

"running his mouth" would get him in trouble. He said that Abdul understands how he got

himself into the situation he is in and that he needs to be an upstanding citizen. He said "I'd be

shocked if he spits on the sidewalk after this."

His mother also said Abdul never discussed any fascination with ISIS. She said that

music has always been part of his life. She did not notice any change in his personality.

Salafi beliefs, of the sort Mr. Koehler attributes to Mr. Ali-Skelton, are fundamentalist

beliefs. Salafis are very conservative and pious in their religious beliefs. T. 36. Such religious

rigor is completely at odds with Mr. Ali-Skelton's behavior. Mr. Koehler failed to reconcile Mr.

Ali-Skelton's behavior with his statements, so never considered whether Abdul actually believed

the things he said, and if so, whether he would actually act on them.

Moreover, Abdul's wife and parents confirm that Abdul never abandoned his roles as

husband, father, son, or American citizen and never identified as an Islamic extremist. Curiously,

Mr. Koehler failed to mention any of this information in his report presumably because it was

inconsistent with his own narrative.

Mr. Koehler's focus on role residuals is based on the idea that if a person says "X"—for example, "ISIS is helping the Syrian people," he believes X to be true. Whether or not that is true in the typical case, it is not true here. As a result of his histrionic personality, Abdul says things to be provocative, to trigger a reaction, thereby putting himself at the center of attention. This tendency is exaggerated by social media. Facebook posts and tweets are tailor-made for grandiose, inflammatory pronouncements. There is no room for nuance in 140 characters, as a casual review of the President-elect's tweets will confirm. When you take a person such as Mr. Ali-Skelton, who is psychologically predisposed to make extreme statements, and then focus on his posts and tweets on a social media forum designed to encourage inflammatory statements, you end up with a highly distorted image of that person. Yet, review of social media is central to Mr. Koehler's analysis. In this case, one could just as easily attempt to draw an accurate sketch of Abdul Ali-Skelton based on his image in a funhouse mirror.

Mr. Koehler's analysis is even more suspect because, as he concedes, he uses a qualitative, subjective approach. T. 47, 118. He does not rely on "structured assessment protocols." T. 49. "Qualitative," according to Mr. Koehler, "means based on my expert experience, research and own opinions." T. 118. That expertise consists of a masters of peace and security studies, completed in 2011, and six years working as a consultant and counselor in connection with right wing extremism.

Mr. Koehler decides for himself what constitutes a role residual, and what the significance of that residual is. As he explained, a role residual can be evidenced by a statement, a word, a behavior, or even an omission. T. 144-45, 149-150 (use of word "Jahiliyyah" is role residual). Failure to mention something that Mr. Koehler considers significant is treated as intentional and thus reflects a role residual and lack of critical reflection. T. 100-101, 147. Thus,

a person who is gregarious will do better in this assessment than one who is shy. A person who takes longer to warm up to an interviewer before revealing his inner-most thoughts will do worse. A person better able to articulate a coherent narrative will do better because Mr. Koehler relies on a "semi-structured narrative interview" in which he does not ask specific questions. T. 147.

This approach is not well-suited to the American criminal justice system in which lawyers protect their clients by advising them to give short, direct answers to the questions posed to them and then wait for the next question. Lawyers typically advise their clients not to give long, rambling narrative accounts, but rather to wait for the next question. Yet, Mr. Koehler penalizes his interviewees for following this advice.

There is no empirical data supporting Mr. Koehler's methodology. T. 159. His radicalization assessment is wholly subjective. He alone identifies role residuals. He alone determines whether a subject's account was credible. "As an expert I make the assessment and make the decision based on my experience with other cases and my research if the information indicates to me a truthful, credible opening or not." T. 199. Mr. Koehler's expertise, on which he harkens back whenever challenged, is essentially a black box. His conclusions are valid because he is an expert. Trust me.  He explained, "I'm sitting here because I'm an expert on this field and so I was asked about my specific opinion." T. 118. In the end, that expertise is impossible to rely on because the conclusions which result from it are not empirically-based, not quantifiable, not replicable, not verifiable, not subject to a margin of error, not subject to validation, and—conveniently for Mr. Koehler—not subject to challenge.

By choosing what to emphasize in his report, Mr. Koehler can always create a narrative that supports his conclusion. For example, as noted above, Abdul's parents and his wife observed

no sudden increase in religious observance on his part, yet Mr. Koehler failed to mention that. Although he stressed in his report that Abdul was more concerned about the Syrian conflict than any other, in fact, what Abdul said was, "As a Muslim, I feel for other Muslims. As a human, I feel for humans in conflicts all over the world." This statement did not support the radical Islam narrative, so went unreported. In addition, Abdul told Mr. Koehler that he was engaged in a Bible study in jail in which the participants compared the Bible, the Koran, and the Torah, looking for commonalities. He has both a Catholic and a King James version of the Bible. He encourages Muslims to read the Bible. But again, those facts did not fit the narrative and so, were not included in the report.

Mr. Koehler's interview with Mr. Ali-Skelton lasted just over an hour. His collateral interviews, with Abdul's wife and parents, collectively lasted for approximately an hour. He administered no psychometric testing. For that reason, he was unable to assess any other explanation for Mr. Ali-Skelton's statements and behavior other than that he was a Jihadi. This is no different than a doctor who, faced with a patient who refuses to stand up and walk across the room, announces that he is simply intransigent, without first examining him to determine whether he is paralyzed.

By contrast, Dr. Boswell spent 10 hours with Mr. Ali-Skelton. He conducted a battery of highly respected and well-established psychometric tests. He was able to rule out, for example, the possibility that Abdul was malingering. He was able to test for the presence of psychopathy and determined that Abdul does not meet the criteria for a psychopath or display the characteristics of one suffering from an antisocial personality disorder. Thus, he does not lack empathy for others of a sort that might make him willing to engage in violence.

Dr. Boswell concluded that there was no "credible evidence that Mr. Ali-Skelton's

actions with respect to federal charges, were the result of radicalized extremist terrorist beliefs. Rather, the evaluation indicated his actions were the result of untreated mental illness and substance use." Ex. A at 19. Respectfully, this conclusion, from a board-certified clinical psychologist with over 25 years of clinical and forensic experience, relying on data gathered from validated and standardized psychometric tests, is far more credible than the unsubstantiated "expertise" of a 31 year old with a masters degree.

In the end, Mr. Koehler got it half right. He was correct that Mr. Ali-Skelton has a low risk of re-offending and is disengaged from radical Islam. But that is not because he has transformed himself over the last year. It is because he was never a Salafi/Jihadi or a radical extremist. He never provided support to a terrorist organization, never espoused a belief in committing acts of violence to advance political objectives, and, in fact, has always been steadfast in his opposition to violence. Abdul has always viewed Islam as being about peace and tolerance, the opposite of what ISIS stands for.

Mr. Ali-Skelton did not lie to protect members of ISIS or to conceal terrorist activities. He never intended to carry out a terrorist attack or hurt anyone. He never intended to join ISIS or any other terrorist organization or to advance their cause, which he considers to be immoral and contrary to the tenets of Islam and the Koran.

Throughout his extensive interviews with the FBI, Mr. Ali-Skelton made clear that he opposed acts of violence and did not share the views of ISIS. For example, in the FBI report of its interview with Mr. Ali-Skelton on June 17, 2015, the agents summarize Mr. Ali-Skelton's views of ISIS as follows:

> [Ali-Skelton] realized there were all kinds of Muslims, and some were bad. When
> asked what he meant by this, Skelton acknowledged being aware of Muslims who
> were interested in committing acts of violence. He specifically named ISIS
> (Islamic State of Iraq and Sham) as being a group composed of people who use

violence to further their goals.

Later, Ali-Skelton expanded his remarks to include Al Qaeda:

> Skelton stated that he previously explored Al Qaeda, believing they were doing what they did to protect Muslims. He stated that he later learned al Qaeda and the Islamic State were both killing innocent people, causing him to reject them.

Mr. Ali-Skelton made clear that he did not share the views or objectives of terrorist groups. "Skelton informed interviewers he considered it his duty to inform the authorities of any planned attacks or other acts of violence should he hear about these in the course of his normal life."

In the tape recording of the conversation, Mr. Ali-Skelton explained that although ISIS propaganda presented the group as freedom fighters fighting on behalf of Islam, that did not square with reality: "And then you see the reality, we're gonna take this town over, enslave all the women, rape them, sell them like property, kill all the men, make everyone watch, and if you leave, we'll kill you. That's the reality on the ground there. That's not Islam." PSR ¶ 13.

In hours of recorded interviews with the FBI in the weeks that followed, Mr. Ali-Skelton continued to make clear that he saw ISIS as evil. (Although the taped recordings are perhaps the best source of information about Abdul's thought process in 2015, Mr. Koehler failed to review them.) On July 7, 2015, he said that although ISIS had "fantastic propaganda," he "was able to see through that." PSR ¶ 10. He said that as he learned what ISIS was doing, he realized, "[t]hey're not good. They're really bad." *Id*. He told people that "[j]ust because I supported a couple of things they did does not mean I am with them or have anything to do with them." *Id*. "When you see the reality of what they are doing," he said, "it's disgusting." *Id*. Under the ISIS regime, "if you go outside and you say the wrong thing, you get your head chopped off," he said.

*Id*. Abdul made clear that he was never "advocating going out killing people." *Id.*

In a conversation on July 8, 2015, Abdul told the FBI that he rejected Abu Dujana's suggestions that he participate in a terrorist attack. He told Abu Dujana "he did not want to kill innocent people, he was not into that, and he was not his guy." PSR ¶ 14. As Ali-Skelton explained to the FBI, "If you kill innocent people, you go to hell." *Id.* Later, he said, "I just did a lot of soul searching, and I'm like, I don't want to kill innocent people." PSR ¶ 16. Abdul repeated similar statements throughout his conversations with the FBI.

Mr. Ali-Skelton does not need to be de-radicalized because he was never radicalized in the first place. Once he became aware of the acts of violence sponsored by ISIS and other terrorist organizations, he rejected them on his own. His only interest was in supporting the Syrian people through humanitarian aid.  He never viewed the U.S. government as evil or the West as the enemy of Islam. He was born and raised in Iowa. On July 8, 2015, he told the FBI that his mother works for the federal government and that mostly he supports the U.S. government. Of course, he has policy disagreements with the government, as do most loyal citizens, but he is proud to be an American.

II.     The 3553(a) Factors Warrant a Downward Variance and a Probationary Sentence

This case boils down to a 22-year-old man, predisposed to histrionic flights of fancy, who panicked when questioned by the FBI and lied—not to cover up any crime, but just because he was scared. As soon as counsel was appointed to represent him, he immediately corrected his earlier misstatements. As a result, the offense began and ended within a matter of weeks. Given the unusual circumstances of this case, the Section 3553(a) factors support a sentence of probation.

As the Supreme Court has recently reminded us, probation is not getting off easy. "[P]robationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Gall v. United States*, 128 S.Ct. 586, 595 (2007) (citation omitted). Defendants deserving of a probationary sentence, have not escaped justice or been given a "break."

> Probation is not granted out of a spirit of leniency. . . . [P]robation is not merely 'letting an offender off easily.' The probation or parole conditions imposed on an individual can have a significant impact on both that person and society. Often these conditions comprehensively regulate significant facets of their day-to-day lives. They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a case worker or psychotherapist.

*Gall*, 552 US. at 595 n. 4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) and 1 N. Cohen, The Law of Probation and Parole, § 7:9 (2d ed. 1999)).

A review of the statutory factors under § 3553(a) establishes that this is not the sort of case contemplated by the applicable guidelines. A term of probation is "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in that statute.

A.  History and Characteristics of the Defendant

Abdul Ali-Skelton is not a terrorist. To use the vernacular, he is a b.s. artist who knew that by alluding to ISIS he would provoke a response. He did not do this out of malice or to make mischief. He did it because he suffers from a mental illness—histrionic personality disorder, which makes him unable to appreciate realistically the seriousness of his situation and predisposes him to make inflammatory statements designed to provoke a reaction. He is unable to truly appreciate the serious impact his statements will have on the listener and so says foolhardy, impetuous things.

Before this offense, Abdul's criminal record consisted of two misdemeanors and some driving offenses.  Yet, because of application of § 3A1.4, he is treated as criminal history

category VI. This grossly exaggerates the severity of his record or the risk that he will re-offend. *See United States v. Bankhala*, 501 F. Supp. 2d 748, 759 (E.D. Va. 2007) (granting downward departure under § 4A1.3 because CHC VI as a result of application § 3A1.4 for an offender with no criminal record "clearly over-represents the seriousness of his criminal history").

The people who know him best know Abdul to be an intelligent, loving person. He was active in school and community activities, and he held a number of jobs through high school. He was a natural musician, and he studied German. Since then, he has married and has a daughter to whom he is devoted.

B.  Seriousness of the Offense

Any offense implicating terrorism is a serious offense, but this case is far less serious than typical. The only offense that Mr. Ali-Skelton committed was lying to the FBI. He did not commit a terrorism offense or even contemplate such an offense. He did not attempt to cover up an offense by lying. The offense began and ended within a matter of weeks. Mr. Ali-Skelton *rejected* suggestions that he commit violent acts. Out of curiosity, boredom, and a histrionic attraction to drama, Abdul explored ISIS and then *rejected* the group and everything it stood for. He never joined the group, endorsed its acts, or provided material support. To treat this case as one more terrorism case, as the guidelines do, equating Abdul's conduct with that of the young men who attempted to travel to Syria, for example, is to ignore reality and grossly exaggerate the seriousness of this offense. *See, e.g., United States v. Bankhala*, 501 F. Supp. 2d 748, 760 (E.D. Va. 2007) (granting downward variance "because the nature of making false statements is not considered as serious a crime as the Defendant's guideline range [under § 3A1.4] indicates").

The fact that a mental illness significantly contributed to the offense conduct further mitigates against the seriousness of the offense.

C.      Respect For the Law and Just Punishment

Respect for the law is not promoted by simply ramping up sentences so that the public can see that justice is harsh.  Rigid adherence to mathematical guideline certainty without regard for the specific facts and circumstances of the case discourages respect for the law.  A sentence that reflects the unique mitigating circumstances of an offense and the exemplary life of the defendant promotes respect for the law.  The Supreme Court in *Gall* cited approvingly the district court's rationale for sentencing Gall to a probationary term for a serious drug offense, that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *Gall v. United States*, 128 S.Ct. 586, 599 (2007).

Had the guidelines been based only on Mr. Ali-Skelton's actual offense conduct, without terrorism enhancements, he would be facing a guideline range of 10-16 months. This range more accurately reflects the offense conduct because here there was no actual terrorism offense. A sentence in this range assures a just punishment and avoids unwarranted disparity. Mr. Ali-Skelton has been in custody since March 27, 2016, over nine months. (He has been in federal custody since April 27, 2016.)

The government has suggested a sentence of 8 years, more than Mr. Yusef or Mr. Warsame received and nearly as much as four of the other defendants in the recent case before Judge Davis. *See United States v. Yusef*, Crim. No. 15-46; *United States v. Warsame*, Crim. No. 16-37; *United States v. Hamza Ahmed*, Crim. No. 15-49. Mr. Yusef was sentenced to time served, one year, eight months, and 22 days. Mr. Warsame received 3 years. Four other defendants were sentenced to ten years. Treating a defendant who lies as equally culpable as

ones who attempt to travel to Syria and who provided material support to a terrorist organization does not engender respect for the law.

D.     General and Specific Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

These results are not surprising.  Potential criminals are not generally aware of the penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers.

Mr. Ali-Skelton was prosecuted and has already served in excess of nine months for lying to the FBI. The message is thus clear that if you lie to the government you will be punished. People lie to the government in order to protect themselves and others. They do so because they believe they can get away with it, not because they think that punishment will be light if they get caught.

In these circumstances, a sentence to time served will have a significant deterrent effect, while recognizing that a person who *rejects* violence should be treated more leniently than one who embraces it.

In addition, there is no evidence that Mr. Ali-Skelton needs to be incapacitated to protect the public. Both Dr. Boswell and Mr. Koehler agree that Mr. Ali-Skelton is a low risk of re-offending. As Dr. Boswell concluded, there is no credible evidence that Abdul ever embraced a Jihadi mindset. Yes, he makes troubling, inflammatory statements. That is symptomatic of a mental illness that can be successfully treated. He has never acted to carry out any of his grandiose statements. They are like a temper tantrum or an outburst by someone with Tourette's syndrome. They cannot be taken seriously.

E.  Providing the Defendant With Effective Medical Care

As Dr. Boswell explains, there are effective therapies for histrionic personality disorder. Mr. Ali-Skelton is amenable to treatment. Through treatment, "Mr Ali-Skelton can achieve significant insight into the origins and consequences of his personality dysfunction and drug use." Ex. A at 19. He warns, however, that "[i]t is critical that Mr. Ali-Skelton be provided access to mental health treatment at the earliest possible opportunity." Ex. A at 1. If he receives appropriate treatment, Dr. Boswell concludes, "his prognosis is quite favorable."

Mr. Koehler, although completely failing to consider a psychological basis for his behaviors, agrees that Mr. Ali-Skelton is at "a critical turning point." Koehler Report at 5.

Mr. Ali-Skelton will not get the psychological services he needs while in custody. Instead, he will be exposed to radical and ill-advised opinions about the tenets of Islam. A sentence of imprisonment will fail to address Mr. Ali-Skelton's needs and could prove to be counterproductive.

CONCLUSION

For the foregoing reasons, this Court should sentence Mr. Ali-Skelton to a sentence of 8 ½ months, the time already served in federal custody, followed by a three-year term of

supervised release. As conditions of supervised release, the Court should require, in addition to the standard conditions of release, the following:

1. Reside for 3 months in a halfway house with work release;

2. Take part in a program of psychological counseling;

3. Take part in a program of drug and alcohol rehabilitation;

4. Submit to random drug testing;

5. Do not use alcohol to excess;

6. Obtain employment or attend school full-time;

7. During periods of unemployment, complete 10 hours of community service per week.

A sentence structured in this way properly addresses the issues that led to the offense conduct in this case while focusing on the defendant's actual conduct and personal circumstances—not on fear and speculation.

Mr. Ali-Skelton is not a terrorist. He lied to the FBI. He did not commit a terrorist act nor did he attempt to cover one up. The proposed sentence is proportionate to the actual offense conduct.

Dated:  December 30, 2016

Respectfully submitted,

*s/ Robert D. Richman*
ROBERT D. RICHMAN
Attorney ID No. 226142
P.O. Box 16643
St. Louis Park, MN  55416
(651) 278-4987

Attorney for Defendant